b

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

DELTA FUEL CO., INC.            CIVIL ACTION NO. 1:18-CV-01334

VERSUS                      UNASSIGNED DISTRICT JUDGE

TODD ABBOTT               MAGISTRATE JUDGE PEREZ-MONTES

---

REPORT AND RECOMMENDATION

Plaintiff Delta Fuel Co., Inc. ("Delta") filed a Motion to Stay and Compel Arbitration (Doc. 7). Because there is an enforceable arbitration agreement between the parties, which encompasses the issues raised in this action, Delta's Motion to Stay and Compel Arbitration (Doc. 11) should be GRANTED.

I.     Background

Delta filed a petition in the Louisiana Seventh Judicial District Court in Concordia Parish seeking a temporary restraining order ("TRO") and permanent injunctive relief against Defendant Todd Abbott ("Abbott"). (Doc. 1-1). Delta contends it hired Abbott in February 2018 to establish and run a new division of Delta (the Oil Services Division) in order to provide significant additional services to Delta's customers. (Doc. 1-1). Delta alleges it invested over $500,000 in the new division (Doc. 1-1). Abbott worked in Delta's Shreveport facility, but had responsibilities in every Delta location. (Doc. 1-1). Abbott resigned in July 2018 after having met Delta's existing customers and learned "significant" confidential business information regarding Delta's operations. (Doc. 1-1).

When Abbott left Delta, he immediately resumed working for RelaDyne, Inc., one of Delta's competitors and the parent company of Abbott's previous employer. (Doc. 1-1). Delta alleges that Abbott immediately started contacting Delta's customers on behalf of RelaDyne, violating the "Confidentiality and Restrictive Covenant Agreement" ("CRC Agreement") that Abbott signed when he began working for Delta. (Doc. 1-1). Delta demanded that Abbott cease and desist any current or future breach of his contractual obligations. Delta then filed this action for injunctive relief to enforce Abbott's obligations to Delta, and to recover costs and attorney's fees. (Doc. 1-1).

Delta contends its employees introduced Abbott to executives of Delek U.S. Holdings refineries (Doc. 7-1). Delta further contends that, after Abbott left Delta, he contacted Delek executives on behalf of RelaDyne (Doc. 7-1).

Abbott claims that, prior to his employment with Delta, he was a longtime employee of Hill Oil Company, which was subsequently acquired by RelaDyne, Inc. (Doc. 11). Abbott contends Delta began to solicit him for employment in July 2017, and he agreed to work for Delta in February 2018. (Doc. 11). However, Delta misrepresented the nature and scope of its business, resources, capabilities, and customers, and the corresponding opportunity to be realized. (Doc. 11).

Abbott and Delta memorialized an agreement (the "Acknowledgment") that Abbott would not be asked or required to produce any information related to the business or customers of his former employers. (Doc. 11; Doc. 11-2). Abbott also received a "sign-on bonus" that he agreed to be reimburse to Delta if he resigned

2

within one year. (Doc. 11). Abbott contends that, after he began working for Delta, it became clear that Delta had no ability to service customers, and did not have "a multitude" of existing accounts. Abbott alleges that Delta directed him to generate his own accounts by stealing RelaDyne customers, and instructed him to ignore the just-executed Acknowledgment because it was only created to "keep them out of trouble." (Doc. 11, p. 7).

The state court issued at TRO, enjoining Abbott from: (1) engaging in any business that competes with Delta within the area specified in the CRC Agreement; and (2) from soliciting Delta's clients, employees, and contractors. (Doc. 1-2).

Abbott removed. (Doc. 1). Abbott premises jurisdiction on diversity of citizenship. (Doc. 1).

Abbott answered the complaint and asserted a counterclaim: (1) alleging breach of contract and duty of good faith; (2) seeking judicial dissolution of the CRC Agreement; (3) alleging detrimental reliance; and (4) alleging violation of the Louisiana Unfair Trade Practices Act, La. R.S. 51:1405, *et seq.* ("LUTPA"). (Doc. 6). Delta responded by filing a Motion to Stay and Compel Arbitration (Doc. 7). [1]

---

[1] Neither party requested an evidentiary hearing, either unprompted or after inquiry from the Court. To obtain an evidentiary hearing on the validity of the arbitration agreement, a plaintiff must make at least "some showing that under prevailing law" he would be relieved of his contractual obligation to arbitrate if his allegations prove to be true, and he must produce "some evidence" to substantiate his factual allegations. See Lasseigne v. Sterling Jewelers, Inc., 2017 WL 1788292, at *5 (E.D. La. 2017) (citing American Heritage Life Ins. Co. v. Orr, 294 F.3d 702, 710 (5th Cir. 2002); Chester, 607 Fed. Appx. at 365).

II.     Law and Analysis

      A.     Arbitration pursuant to the Federal Arbitration Act.

Delta contends the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, mandates arbitration of the parties' claims because there is an arbitration clause in the CRC Agreement.

"Arbitration is favored in the law." Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 526 (5th Cir. 2000), cert. den., 531 U.S. 1013 (2000) (citing Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24-25 (1983)). Section 2 of the Federal Arbitration Act ("FAA") provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Moses H. Cone Memorial Hospital, 460 U.S. at 24 (citing 9 U.S.C. § 2).

Section 2 "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." Id. It was "Congress's clear intent . . . to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." Moses H. Cone Memorial Hospital, 460 U.S. at 22. The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." Id. at 24-25. "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability." Tittle v. Enron Corp., 463

F.3d 410, 418 (5th Cir. 2006) (quoting AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650 (1986)).

An agreement to arbitrate is "enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; see also Duhon v. Activeleaf, L.L.C., 2016-0818 (La. 10/19/16), __So.3d__, 2016 WL 6123820 at *6, cert. den., 137 S. Ct. 2268 (U.S. 2017) (citing 9 U.S.C. § 2).

Accordingly, to determine if the parties agreed to arbitrate, the court should consider "(1) whether a valid agreement to arbitrate between the parties exist; and (2) whether the dispute in question falls within the scope of that arbitration agreement." Pennzoil Exploration & Production Co. v. Ramco Energy Ltd., 139 F.3d 1061, 1065 (5th Cir. 1998); see also Tittle, 463 F.3d at 418.

Where the issue is whether the parties have a valid and enforceable agreement to arbitrate, courts apply the contract law of the state governing the agreement. See Banks v. Mitsubishi Motors Credit of America, Inc., 435 F.3d 538, 540 (5th Cir. 2005); see also Huckaba v. Ref-Chem, L.P., 892 F.3d 686, 688 (5th Cir. 2018); Duhon, 2016 WL 6123820 at *7. A district court must hold a trial on the existence of an arbitration agreement if a motion to compel arbitration is filed and the making of the arbitration agreement is "in issue." 9 U.S.C. § 4. See Chester v. DirecTV, L.L.C., 607 Fed. Appx. 362, 363 (5th Cir. 2015). To put the making of the arbitration agreement "in issue," a party is required to "unequivocally deny" that he agreed to arbitrate and produce "some evidence" supporting his position. Chester, 607 Fed. Appx. 362, 363–64 (citing T & R Enterprises, Inc. v. Continental Grain Co., 613 F.2d 1272, 1278 (5th Cir. 1980)).

B.    The CRC Agreement was a valid employment contract between Delta and Abbott.

In its Motion to Compel, Delta argues that its lawsuit and Abbott's counterclaims fall within the scope of the arbitration clause in the CRC Agreement. However, in response, Abbott contends there is not a valid contract between himself and Delta because: (1) he "signed" the CRC Agreement through an electronic portal system that contained prompts and a click feature to produce an electronic signature only on a separate page; (2) Delta never signed the CRC Agreement; (3) neither arbitration nor any of the restrictive provisions in the CRC Agreement were discussed between the parties, either before or after Abbott signed it electronically; (4) the effective date of the CRC Agreement was left blank; (5) Abbott did not initial each page in the blanks for him to do so; and (6) Abbott believed he was signing a draft of the CRC Agreement which would be discussed and formally signed at a later date. (Doc. 11).   Because of these factors, Abbott argues the CRC Agreement was never executed and the arbitration clause is not binding.  (Doc. 11).  Abbott does not argue that the lawsuit and his counterclaims do not fall within the scope of the arbitration clause.

In reply, Delta contends Abbott's electronic signature was sufficient, and it was not necessary for Delta to sign the contract.

The FAA requires a judge to refer a matter to arbitration upon being satisfied that the issue involved is referable to arbitration.  See Jolley v. Welch, 904 F.2d 988, 994 (5th Cir. 1990), cert. den., 498 U.S. 1050 (1991).  In order for a court to order arbitration, there must be a valid agreement to arbitrate.  See Jolley, 904 F.2d at 994.

Under Louisiana law,[2] a valid contract requires capacity, consent, a lawful cause, and a valid object. See Granger v. Christus Health Central Louisiana, 12-1892 (La. 6/28/13), 144 So. 3d 736, 760-61; see also La. C.C. arts. 1918, 1927, 1966, 1971. Consent is "established through offer and acceptance," which may generally "be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." La. C.C. art. 1927. "It is not defendant's burden to prove the non-existence of an agreement; it is the burden of the party seeking to enforce a contract to show the contract exists." FIA Card Services, N.A. v. Weaver, 10-1372 (La. 3/15/11), 62 So. 3d 709, 719 (citing La. C.C. art. 1831). Accordingly, Delta has the burden of proving the contract exists by a preponderance of the evidence. See Lasseigne, 2017 WL 1788292 at *5 (citing Grant v. Houser, 469 Fed. Appx. 310, 315 (5th Cir. 2012)).

Abbott argues his signature on the contract was inadequate because it was affixed electronically. Under the Louisiana Uniform Electronic Transactions Act, "[a]n electronic record or electronic signature is attributable to a person if it was the act of the person." La. R.S. § 9:2609(A)(1) and (2); see also Lasseigne v. Sterling Jewelers, Inc., 2017 WL 1788292, at *5 (E.D. La. 2017). The Act further states the effect of an "electronic signature attributed to a person . . . is determined from the context and surrounding circumstances at the time of its creation." La. R.S. § 9:2609(B); see also Lasseigne, 2017 WL 1788292 at *5.

---

[2] The parties agree that Louisiana law applies.

In Louisiana, a contract may be formed electronically between an electronic agent and an individual.  See La. R.S. 9:2614.  Louisiana law gives legal effect to both electronic contracts and signatures.  See La. R.S. § 9:2607.[3]  Therefore, under Louisiana law, in the absence of fraud, misrepresentation, or deceit, one is bound to the terms of a contract signed electronically.  See Hill v. Hornbeck Offshore Services, Inc., 799 F. Supp. 2d 658, 661 (E.D. La. 2011) (citing In re Cajun Electric Power Co-operative, Inc., 791 F.2d 353, 359 (5th Cir. 1986)).

Abbott admits he affixed his electronic signature to the CRC Agreement.  (Doc. 11-1).  The signature page of the CRC Agreement states:

> Restrictive Covenant Signoff
> *Please carefully review this agreement and then electronically sign denoting your acceptance.*
> Attachment: DFCI Restrictive Covenant Agreement
> Signature:

It is clear from the wording of the signature page that Abbott was signing and agreeing to the CRC Agreement.  Under Louisiana law "[i]t is well settled that a party who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that he did not understand it, or that the other party failed to explain it to him."  Lasseigne, 2017 WL 1788292, at *5 (quoting Aguillard v. Auction Management Corp., 908 So. 2d 1, 17 (La. 2005)); see

---

[3] Likewise, the federal Electronic Signatures in Global and National Commerce Act, 2000 Acts, Pub. L. 106-229, § 1 (June 30, 2000), 114 Stat. 464, establishes a general rule of validity for electronic signatures in transactions in or affecting interstate commerce. See 15 U.S.C. § 7001; see also Blake v. Murphy Oil USA, Inc., 2010 WL 3717245, at *3 (N.D. Miss. 2010).

also <u>Hill</u>, 799 F. Supp. 2d at 662 ("Whether Hill understood the terminology is simply irrelevant.  As a principle of contracts, the law does not compel people to read or inform themselves of the contents of an instrument which they may choose to sign, but it holds them to the consequences in the same manner and to the same extent as though they had exercised those rights.").  "The presumption is that parties are aware of the contents of writings to which they have affixed their signatures . . . . The burden of proof is upon them to establish with reasonable certainty that they have been deceived."  <u>Aguillard</u>, 908 So.2d at 17 (citing <u>Tweedel v. Brasseaux</u>, 433 So.2d 133, 137 (La. 1983)).

Abbott states in his affidavit (Doc. 11-1):

9. On February 19, 2018, I was not provided a draft employment agreement by Delta, nor was one discussed.

10. At some subsequent time, the specific date of which is unknown by me, Delta officials instructed be to log into an electronic portal system that contained prompts and a click feature to produce an electronic signature.

11. Following Delta's instruction, I logged into the electronic portal system and clicked the buttons required for completion of the prompts.

12. My belief was that completion of the prompts through the electronic system would produce a document to be tendered to Delta for their completion and execution prior to a completed and binding employment agreement.

13. At no point did I ever discuss arbitration with Delta officials.

Abbott has not alleged or shown that Delta deceived him as to the CRC Agreement or the arbitration clause.[4]  Instead, he only alleges that he thought he was signing a preliminary draft.  Abbott's misapprehension as to whether the CRC Agreement he signed was a preliminary draft or the final version of the contract does not void the contract in general or the arbitration clause in particular.  The context and circumstances surrounding Abbott's electronic signature on the CRC Agreement demonstrate, by a preponderance of the evidence, that Abbott signed the CRC Agreement and agreed to arbitration, whether he reviewed the agreement or not.  See Lasseigne, 2017 WL 1788292 at *5 (citing La. R.S. 9:2609).

Abbott also argues the CRC Agreement is not valid because it was not signed by a Delta employee.  La. C.C. art. 1927 states: "A contract is formed by the consent of the parties established through offer and acceptance.  Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.  Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made."

There is no requirement under Louisiana law that an employment restrictive covenant agreement with an arbitration clause be signed.   The CRC Agreement was confected and provided by Delta–it is Delta's document.  Delta extended the terms of

---

[4] The arbitration clause is the fourth provision in the eight-page CRC Agreement.  It is titled "Arbitration."  It is the same size font as the rest of the contract.  And its provisions deal entirely with arbitration and occupy about half of a page.

the offer to Abbott through the CRC Agreement, and Abbott accepted by signing the contract electronically. Both parties then began to perform in accordance with the contract. Abbott worked for Delta for about five months, and Abbott was introduced to Delta's clients. The parties also had a contract for a written "Sign-On Bonus,"[5] and an "Acknowledgement and Agreement" to show Delta's employment offer was not being made in exchange for protected information from Abbott's prior employer. (Docs. 11-2, 11-3).

Likewise, the contract is not void because an effective date was not included. Abbott admits he worked for Delta. The CRC Agreement includes a confidentiality clause, defines company property, and specifies Abbott's geographical territory for work. Abbott does not allege those provisions were inapplicable to him while he was working for Delta. Therefore, the effective date of the CRC Agreement was, at the latest, Abbott's first day of work for Delta.

Abbott argues this case presents facts similar to those in Huckaba v. Ref-Chem, L.P., 892 F.3d 686 (5th Cir. 2018), and that the holding in Huckaba should govern this case. Abbott contends the Huckaba court found no contract existed because the parties clearly intended that the contract be signed by both parties, and it was not. However, Huckaba applied Texas law, which states that whether a signature is required to bind the parties is a question of the parties' intent. Huckaba, 892 F.3d at 689. The reasoning in Huckaba is inapplicable here because, as discussed

---

[5] Abbott does not contend he did not receive the sign-on bonus.

above, Louisiana law does not require signatures to execute a contract except where required by law.  Abbott has not identified any Louisiana law requiring an employer's signature on a restrictive covenant agreement.

Accordingly, the CRC Agreement is a valid contract, and Abbott is bound by the arbitration clause therein.

## C.   The case should be stayed and referred to arbitration.

Next, the Court must determine whether the dispute in question falls within the scope of that arbitration agreement.  Abbott does not dispute the existence of the arbitration clause, or that the issues in this lawsuit fall within the scope of the arbitration clause.  The issues presented in the action clearly fall within the broad scope of the arbitration clause in the CRC Agreement.

The Fifth Circuit distinguishes between broad and narrow arbitration clauses. See Broussard v. First Tower Loan, L.L.C., 150 F. Supp. 3d 709, 724 (E.D. La. 2015), modified, 2016 WL 879995 (E.D. La. 2016).  If the clause is broad, the action should be stayed and the arbitrators permitted to decide whether the dispute falls within the clause. On the other hand, if the clause is narrow, the matter should not be referred to arbitration or the action stayed, unless the court determines that the dispute falls within the clause.  See Hornbeck, 981 F.2d at 754-55 (citing Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (Pennex), 767 F.2d 1140, 1145 n.10 (5th Cir. 1985)).

The CRC Agreement (Doc. 1-1; Doc. 7-2) includes clauses governing an employee's duty of loyalty, non-disclosure of confidential information, a non-competition clause, a non-recruitment clause, the scope of remedies for breach of the

Agreement, and an arbitration clause.  The arbitration clause in the CRC Agreement

states (Doc. 1-1, p. 32):

> 4.    Arbitration.    Except as otherwise specifically provided in this
> Agreement, the Company and the Employee agree to submit exclusively
> to final and binding arbitration *any and all disputes or disagreements*
> *relating to or concerning the interpretation, performance or subject*
> *matter of this Agreement and all disputes arising out of Employee's*
> *employment, including the terms, conditions and termination thereof,*
> in accordance with the National Rules for the Resolution of Employment
> Disputes of the American Arbitration Association ("AAA") using a single
> arbitrator.  The parties acknowledge and agree that this Agreement and
> the parties' employment relationship affects and involves interstate
> commerce and that this Agreement is governed by the Federal
> Arbitration Act.  The parties waive any right to a jury trial and to pursue
> or participate in class or collective actions with respect to disputes that
> are subject of this Agreement and for which a jury trial, class action or
> collective action would otherwise be available.  The arbitration shall
> take place in Baton Rouge, Louisiana.  The Employee and the Company
> agree that the decision of the arbitrator shall be final and binding on
> both parties.  Arbitration shall be commenced by either party filing a
> demand for arbitration with the AAA within 60 days after such dispute
> has arisen and either party notifies the other that they are at an
> impasse.  Each party in such arbitration proceeding shall be responsible
> for the costs and expenses incurred by such party in connection
> therewith (including attorneys' fees) which shall not be subject to
> recovery from the other party in the arbitration except to the extent
> allowed by law and except that any and all charges that may be made
> for the cost of the arbitration and the fees of the arbitrator shall in all
> circumstances be paid by the Company.  Any court having jurisdiction
> may enter a judgment upon the award rendered by the arbitrator.
> Notwithstanding the provision of this Section 4, the Company may, if it
> so chooses, bring an action in any court of competent jurisdiction for
> injunctive relief to enforce the Employee's obligations hereunder or as
> otherwise specified in Section 3 of this Agreement. [Emphasis added.]

The original action by Delta seeks injunctive relief to prevent Abbott from

violating the restrictive covenant.  The issues raised by Abbott in his counterclaims

involve the terms and conditions of his employment with Delta.  All of those issues

clearly fall within the scope of the arbitration clause.  Compare Alfortish v. GreenSky,

13

L.L.C., 2017 WL 699830, at *8 (E.D. La. 2017) (alleged LUTPA violation is arbitrable); <u>Ryan</u>

<u>v. Thunder Restorations, Inc.</u>, 2011 WL 2680482, at *2 (E.D. La. 2011) (breach of contract

claim is arbitrable).

By its terms, the FAA "mandates that district courts *shall* direct the parties to

proceed to arbitration on issues as to which an arbitration agreement has been signed

. . . absent a ground for revocation of the contractual agreement." <u>Dean Witter</u>

<u>Reynolds, Inc. v. Byrd</u>, 470 U.S. 213, 218 (1985). This mandate applies  here.

Accordingly, Delta's Motion to Stay and Compel Arbitration (Doc. 11) should be

granted.

## III.    Conclusion

Because there is an enforceable arbitration agreement between the parties

which encompasses the issues raised in this action, IT IS RECOMMENDED that

Delta's Motion to Stay and Compel Arbitration (Doc. 11) be GRANTED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b),

parties aggrieved by this Report and Recommendation have fourteen (14) calendar

days from service of this Report and Recommendation to file specific, written

objections with the Clerk of Court. A party may respond to another party's objections

within fourteen (14) days after being served with a copy thereof.  No other briefs (such

as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy

of the objection to the undersigned is neither required nor encouraged. Timely

objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and

recommendations contained in this Report and Recommendation within fourteen (14)

days from the date of its service, or within the time frame authorized by Fed. R. Civ.

P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the

legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this

__14th__ day of June, 2019.

_____

Joseph H.L. Perez-Montes
United States Magistrate Judge